## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

TOLESSA GURMESSA

      Plaintiff,

v.

GENOCIDE PREVENTION IN
ETHIOPIA, INC., et al.,

      Defendants.

C.A. No. 21-869-CFC

FILED

AUG – 8 2024

U.S. DISTRICT COURT DISTRICT OF DELAWARE

### REPORT AND RECOMMENDATION

Pending before the Court is Genocide Prevention in Ethiopia, Inc.'s ("GPE") Motion for Summary Judgment (D.I. 71 the "Motion") seeking judgment in GPE's favor on *pro se* Plaintiff Dr. Tolessa Gurmessa's defamation claim. (D.I. 1). For the following reasons, I recommend that the Court grant the Motion.

### I.    BACKGROUND

GPE states that it is a human rights advocacy group that seeks to combat ethnically motivated attacks on Amharas, a minority ethnic group in Ethiopia. (D.I. 72-1, Ex. 2 at GPE384). In GPE's view, attacks on Amharas are perpetrated by the Tigray People Liberation Front (TPLF), the Oromo Liberation Front (OLF), and other extremists, and the attacks amount to acts of genocide. (*Id.* at GPE382–84). GPE is led by Senait Senay, Ph.D. (D.I. 72-1, Ex. 1).

In March of 2021, GPE reported that a series of ethnically motivated killings against Amharas had occurred throughout Ethiopia. (D.I. 72-2, Exs. 10, 14, 15, 16, 17). Reuters contemporaneously reported on fighting between Ethiopian government troops and the TPLF as U.S. officials expressed concern over the deteriorating situation. (D.I. 72-5, Ex. 23; D.I. 77 at 3 n.4). One image arising from that time period depicts a presumed Amhara man kneeling on a

1

blue and white checkered cloth surrounded by armed men. (D.I. 72-6, Ex. 20, 22, 26). One of the armed men appears to be holding a bayonet near the Amhara man's throat. (*Id.*) In GPE's view, this image was documentary evidence of the Amharan genocide. (D.I. 72-1, Ex. 1 ¶ 15; D.I. 72-3, Ex. 15; D.I. 72-4, Exs. 16, 17).

Dr. Gurmessa shared the image of the kneeling man on his Facebook account with the caption, "Wait, why did they give him a cushion for his knees? Stop the fucking madness. Make him kneel on the fucking gravel." (D.I. 1-1, Ex. 1 at 8). Dr. Senay was made aware of Dr. Gurmessa's posts. (D.I. 72-1, Ex. 1 ¶ 16). She also learned that he was employed by the United States Department of Veteran Affairs ("VA"). (*Id.*) Based on this Facebook post, as well as her review of Dr. Gurmessa's other social media posts, Dr. Senay concluded that Dr. Gurmessa's posts amounted to support of the Amharan genocide. (*Id.* ¶¶ 17–18, 21).

On April 10, 2021, Dr. Senay and her colleagues sent a letter to the VA concerning Dr. Gurmessa's social media posts. (D.I. 1-1, Ex. 1, the "Letter"). The Letter states, among other things, that GPE "learned that [Dr. Gurmessa] openly supports genocide, glorifying torture, lynching, massacre, and ethnic cleansing of Amhara ethnic groups in Oromia Region of Ethiopia." (*Id.* at 1). In the Letter, GPE included a screenshot of Dr. Gurmessa's Facebook post regarding the kneeling man along with screenshots of two of Dr. Gurmessa's other social media posts. (*Id.* at 7–8). One screenshot shows a Tweet in which Dr. Gurmessa says about the female Ethiopian president, "This racist bitch is the worst." (*Id.* at 9). As expressed in its Letter, GPE's view is that Dr. Gurmessa referred to the Ethiopian president "in a derogatory manner because she made a statement that condemned ethnically motivated killings. . ." (*Id.* at 2). The Letter also includes a screenshot of a Tweet where Dr. Gurmessa, in referring to the Ethiopian dam on the Nile River, writes, "If I were Egypt, I'd bomb that dam. #Ethiopia." (*Id.* at 10). In GPE's

2

view, "[b]ecause of the unbounded hatred he has for his country of birth, Dr. Gurmessa also stated his wish that Egypt would bomb the Ethiopian Dam on the Nile, basically calling for and inciting a terrorist activity." (*Id.* at 2).

The Letter was mailed to the VA in Palo Alto, California. (*Id.* at 12). Although seven individuals were listed as having received copies of the Letter (*Id.* at 3), GPE maintains that it did not separately send a copy of the Letter to those individuals. (D.I. 72-1, Ex. 1 ¶ 23). Other than mailing the Letter to the VA, GPE claims that neither it nor Dr. Senay made any further publication of the Letter. (*Id.* ¶ 25). And, GPE maintains that it never received any response from the VA or any representative of the VA to its Letter. (*Id.* ¶ 24). Although Dr. Gurmessa characterizes these facts as either "pure propaganda" or "irrelevant", he does not otherwise appear to materially dispute these facts.[1]

According to Dr. Gurmessa, he was contacted by a VA official on May 7, 2021 to discuss the Letter and he received a copy of it. (D.I. 80 ¶¶ 3–5). On June 17, 2021, Dr. Gurmessa initiated the above-captioned action[2] asserting a claim for defamation, attaching the Letter and its exhibits to his Complaint. (D.I. 1, 1-1). He alleged that GPE "falsely accused him of serious crimes" because the Letter states that "Plaintiff openly supports genocide, glorifies torture, lynching, massacre, ethnic cleansing." (D.I. 1 ¶ 17). Dr. Gurmessa subsequently published the Complaint, including the Letter, on his social media accounts. (D.I. 72-7, Ex. 33, 35; D.I. 72-8, Ex. 39; D.I. 79 at 10).

---

[1]    Dr. Gurmessa does, however, dispute what the image of the kneeling man purportedly depicts, which I address elsewhere in this Report and Recommendation.

[2]    Although Dr. Gurmessa also named as defendants Dr. Senay and another individual associated with GPE, those parties were dismissed. (D.I. 33, 53).

GPE moved to dismiss Dr. Gurmessa's Complaint for failure to state a defamation claim, which the Court denied. (D.I. 33). The docket suggests that the parties engaged in some discovery, but no scheduling order has been entered.

On September 9, 2023, Dr. Gurmessa filed motions "to remove 'confidential' designation of documents; for sanctions based on non-disclosure during jurisdictional discovery; to initiate parallel actions; to order defendant to provide consent for production of email metadata; to compel defendant to produce information on litigation funding resources." (D.I. 69). Although Dr. Gurmessa later withdrew his motions concerning confidentiality designations and initiating parallel actions (D.I. 87), the others are fully briefed (D.I. 69, 78) and remain pending.

On September 14, 2023, GPE filed the instant Motion seeking summary judgment (D.I. 71). The Motion has been fully briefed (D.I. 73, 79, 81). On July 15, 2024, each of these pending motions were referred to me. (D.I. 86).

## II.     LEGAL STANDARDS

A party may move for summary judgment under Federal Rule of Civil Procedure 56. Summary judgment must be granted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden is on the movant to demonstrate the absence of a genuine issue of material fact. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986).

"An assertion that a fact cannot be—or, alternatively, is—genuinely disputed must be supported either by 'citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials,' or by 'showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the

4

fact.'" *Resop v. Deallie*, CA. No. 15-626-LPS, 2017 WL 3586863, at *2 (D. Del. Aug. 18, 2017) (quoting Fed. R. Civ. P. 56(c)(1)(A) & (B)). A factual dispute is genuine only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 150 (2000).

## III.   DISCUSSION

To state a claim for defamation under Delaware law, the plaintiff "must plead and ultimately prove that: 1) the defendant made a defamatory statement; 2) concerning the plaintiff; 3) the statement was published; and 4) a third party would understand the character of the communication as defamatory." *Doe v. Cahill*, 884 A.2d 451, 463 (Del. 2005). A defamatory statement is one that "tends . . . to harm [one's] reputation," thus "lower[ing] him in the estimation of the community" or "deter[ring others] from associating or dealing with him." *Cousins v. Goodier*, 283 A.3d 1140, 1148 (Del. 2022) (en banc) (internal quotation marks omitted).

Not all defamatory statements are actionable. *Id*. at 1149. Allegedly defamatory statements that relate to issues of public concern receive "special protection" under the First Amendment. *Id*. at 1150-52. The Supreme Cout has explained:

> Speech on matters of public concern . . . is at the heart of the First Amendment's protection. The First Amendment reflects a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open. That is because speech concerning public affairs is more than self-expression; it is the essence of self-government. Accordingly, speech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection.

*Snyder v. Phelps*, 562 U.S. 443, 451 (2011). A statement is one of public concern when it can "be fairly considered as relating to any matter of political, social, or other concern to the community." *Id*. at 1150 (quoting *Snyder*, 562 U.S. at 453). This classification is "determined by the content, form, and context of a given statement, as revealed by the whole record." *Id*. (quoting *Connick v. Myers*, 461 U.S. 138, 147–48 (1983)).

When the challenged statement addresses a matter of public concern, "the *sine qua non* of defamation . . . is objective verifiability, whether or not the statement is labeled 'opinion.'" *Cousins*, 283 A.3d at 1155 n. 83, 1156 (citing *Milkovich v. Lorain J. Co*., 497 U.S. 1, 19 (1990)) (citations omitted). That is, the Court's review is on whether statements, which address a matter of public concern, "may be reasonably interpreted as stating or implying defamatory facts about [the plaintiff] that are provably false." *Id*. at 1157; *see also Kanaga v. Gannett Co., Inc*., 687 A.2d 173, 177–78 (Del. 1996). This requires the plaintiff to demonstrate that the statement was provably false. *Id*. (citing *Phila. Newspapers, Inc. v. Hepps*, 475 U.S. 767, 775–76 (1986)). But, if the statement is not provably false, "a defamation action may lie where an opinion implies the existence of an undisclosed defamatory factual basis." *Cousins*, 283 A.3d at 1158 (citing *Ramunno v. Cawley*, 705 A.2d 1029, 1036–37 (Del. 1998)). However, "if it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is not actionable." *Id*. at 1157 (citing *Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1227 (7th Cir. 1993)).

GPE argues that, because the Letter pertains to a matter of public concern entitled to special protection under the First Amendment, the Letter is only actionable if it can be provably false or can interpreted as stating or implying defamatory facts about Dr. Gurmessa. According to GPE, Dr. Gurmessa cannot meet that standard. For the following reasons, I agree.

6

**A. Whether GPE's Letter Was Speech That Addressed a Matter of Public Concern**

GPE's Letter addresses a matter of public concern. The issues of civil unrest and allegations of ethnically motivated violence in Ethiopia received ongoing coverage by various news outlets in and around the time that GPE sent its Letter.[3] The White House issued a statement on the issues and it dispatched United States Senator Chris Coons to attend to issues of "grave concern" in Ethiopia. (D.I. 77 at 3 n.4). For this and similar reasons, the United States issued a "no travel" advisory to Ethiopia. (D.I. 72-3, Ex. 11). Unquestionably, then, a Letter raising the issue of whether Dr. Gurmessa supports genocide in Ethiopia can "fairly be considered as related to any matter of political, social, or other concern to the community," and therefore addresses a matter of public concern. *See Cousins*, 283 A.3d at 1150 (explaining that a "matter of public concern" is "fairly considered as relating to any matter of political, social, or other concern to the community") (quoting *Snyder*, 562 U.S. at 453). In fact, in acknowledging that "the topic of genocide is of public significance," (D.I. 79 at 14), it is not clear that Dr. Gurmessa even disagrees on this point. I further note that this Court previously found that Dr. Gurmessa "does not dispute making social media posts 'to criticize public officials and comment on social issues of the day[.]'" (D.I. 33 at 8, citing D.I. 26 at ¶ 27).

Accordingly, I conclude the Letter addresses a matter of public concern and is entitled to "special protection" under the First Amendment.[4] *Cousins*, 283 A.3d at 1152. Thus, I turn to

---

[3]      Ongoing coverage of such atrocities have appeared in the Washington Post, the European Times and, as Dr. Gurmessa appears to have acknowledged, Fox News. (D.I. 72-5, Exs. 24, 25; D.I. 72-1, Ex. 5). The U.S. State Department has also publicly commented on them. (D.I. 72-3, Ex. 12).

[4]      Construing Dr. Gurmessa's *pro se* opposition to summary judgment liberally, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), to the extent he takes issue with whether the Letter addresses a matter of public concern because it was sent by a private group to his employer, even

whether statements in the Letter "are provably false or, if they are not, whether they imply the existence of actionable defamatory facts" about Dr. Gurmessa. *Id.* at 1153.

### B. Whether the Statements in GPE's Letter Are Provably False or Imply the Existence of Undisclosed Defamatory Facts.

Because the Letter addressed matters of public concern, for Dr. Gurmessa to recover under the tort of defamation, it is Dr. Gurmessa who bears the burden to show that the Letter contained false statements. *Id.* at 1150 (citing *Hepps*, 475 U.S. at 776 ("the common law's rule on falsity—that the defendant must bear the burden of proving truth—must . . . fall . . . to a constitutional requirement that the plaintiff bear the burden of showing falsity, as well as fault, before recovering damages.")).[5]

#### 1. Whether the Letter Contains Statements That Are Provably False

In its briefing, and in arguing for an application of *Cousins*, GPE does not appear to take the position that the statements in the Letter are not defamatory. Indeed, in the Letter, GPE accused Dr. Gurmessa of "openly support[ing] genocide, glorifying torture, lynching, massacre, and ethnic cleansing of Amhara ethnic groups," GPE asked the VA to reassess Dr. Gurmessa's employment and, by virtue of the fact that it was mailed to the VA, GPE published the Letter to one or more people capable of understanding its meaning. *Doe*, 884 A.2d at 463. So, if the statements in the Letter are defamatory, the inquiry before the Court now is whether such statements are actionable under *Cousins*, starting with whether the statements are "provably false." *Cousins*, 283 A.3d at 1157. I agree with GPE that they are not.

---

speech that is communicated privately may nevertheless address a matter of public concern. *See Cousins*, 283 A.3d at 1152 (citing *Connick*, 461 U.S. 138, 145–46).

[5] After recognizing that the U.S. Supreme Court has not addressed whether the *Hepps* rule applies to nonmedia defendants, the Delaware Supreme Court in *Cousins* noted its agreement with "the majority of courts that have addressed this question" and apply "the *Hepps*-based protection for opinion . . . to non-media defendants." *Cousins*, 283 A.3d at 1148 n.40.

I begin with the *Cousins* opinion. In that case, the plaintiff, Mr. Cousins, opposed his local school district's efforts to retire its mascot and nickname, the "Indians," and he filed a complaint against the school district in Pennsylvania state court. *Cousins*, 283 A.3d at 1144. Shortly after Mr. Cousins filed suit, defendant Ms. Goodier sent an email to Mr. Cousins' employer describing, in her view, Mr. Cousins' "racist" actions. *Id.* In the email titled, "Recently Filed Lawsuit Against Unionville Chadds Ford School District Reflects Poorly on the Bayard Firm," Ms. Goodier wrote, "We hope you can reflect upon how shockingly racist and tone deaf this suit is." *Id.* She also wrote: "Our tax dollars and administrative resources will be plunged into countering some shockingly racist statements by Mr[.] Cousins about protecting his white, Christian heritage." *Id.* at 1145. Mr. Cousins filed a complaint against Ms. Goodier in the Superior Court of the State of Delaware alleging that she defamed him with her email, resulting in his forced resignation from his law firm and inability to readily secure other employment in the legal field. *Id.* at 1146. After the Superior Court dismissed Mr. Cousins' defamation claim on multiple grounds,[6] Mr. Cousins appealed. *Cousins v. Goodier*, C.A. No. S20C-11-036-CAK, 2021 WL 3355471, at *1 (Del. Super. Ct. July 30, 2021), *aff'd*, 283 A.3d 1140 (Del. 2022).

The Delaware Supreme Court affirmed. Recognizing that "America is in the midst of an ongoing national debate about what it means to be racist" such that "Americans disagree about a

---

[6] First, the Superior Court categorized the accusations in Ms. Goodier's email as non-actionable "'subjective speculation' or 'merely rhetorical hyperbole.'" *Cousins v. Goodier*, C.A. No. S20C-11-036-CAK, 2021 WL 3355471, at *4 (Del. Super. Ct. July 30, 2021). Second, the Superior Court applied the Delaware Supreme Court's four-part test in *Riley v. Moyed*, 529 A.2d 248 (Del. 1987) to conclude that Ms. Goodier's email did not communicate false statements of fact but instead expressed "non-actionable opinion." *Cousins*, 2021 WL 3355471, at *4. Finally, the Superior Court found that, because Ms. Goodier had "made it clear that she was critiquing [Mr. Cousins'] lawsuit, which had been the subject of media coverage and had been reviewed by members of Bayard," Ms. Goodier had disclosed "the underlying non-defamatory factual basis for her email," which thereby undermined Mr. Cousins' defamation claim. *Cousins*, 2021 WL 3355471, at *7.

long and growing list of things that to some are racist and to others are not," the Supreme Court concluded that Ms. Goodier's statements could not reasonably be interpreted as stating actual facts. *Cousins*, 283 A.3d at 1157–58. The Delaware Supreme Court concluded: "Ordinary readers of her email, instead, would understand her adjectival use of the word 'racist' and her reference to Cousins' 'white, Christian heritage' as expressing her subjective interpretation of the tone and objectives of" his lawsuit against the school district. *Id.* at 1158.

Here, Dr. Gurmessa identifies as allegedly defamatory GPE's statement that Dr. Gurmessa "supports genocide, glorifying torture, lynching, massacre, and ethnic cleansing of Amhara ethnic groups." (*See generally* D.I. 79; D.I. 1).[7] But consistent with *Cousins*, statements in the Letter concerning GPE's view on what it means to "support" "genocide, glorifying torture, lynching, massacre, and ethnic cleansing of Amhara ethnic groups" are not provably false. Both GPE and Dr. Gurmessa's summary judgment submissions confirm that there are divergent views over the ongoing conflicts in Ethiopia and the appropriate characterization of such conflicts.[8] While GPE uses the term "genocide" to describe what it believes are atrocities against Amharas perpetrated by extremists affiliated with the OLA and TPLF, Dr. Gurmessa uses the word "genocide" to describe what he believes are atrocities against

---

[7]    Although Dr. Gurmessa's Complaint identifies two other statements in the Letter that were allegedly defamatory, in focusing their respective briefing on GPE's broader statement that Dr. Gurmessa "supports genocide, glorifying torture, lynching, massacre, and ethnic cleansing of Amhara ethnic groups," I understand both GPE and Dr. Gurmessa to acknowledge that the other statements are essentially covered by GPE's broad assertion. Even if the other two statements were not, for the same reasons as set forth on pages 10–13 herein, I find that Dr. Gurmessa has failed to carry his burden to show that the statements in the Letter are provably false or can interpreted as stating or implying defamatory facts about Dr. Gurmessa.

[8]    Dr. Gurmessa seems to acknowledge these divergent views on issues of international import, writing in his Answering Brief that he "refrains from delving into an extensive discussion about the numerous ethnic groups in Ethiopia and their ongoing conflicts, acknowledging that addressing such global issues falls outside the Court's purview." (D.I. 77 at 15).

Tigrayans perpetrated by the Ethiopian government and Amhara militias.[9] Thus, it is clear to me that there is disagreement as to what constitutes "support" of "genocide" in this context. And under *Cousins*, I understand that it is not my role to "enter into this debate and decide who is right and who is wrong." *Cousins*, 283 A.3d at 1157–58 ("[I]t is clear to us that Americans disagree about a long and growing list of things that to some are racist and to others are not. It is not our role here to enter into this debate and decide who is right and who is wrong. In fact, we think that the First Amendment is clear that doing so would be the opposite of our role."). Instead, I can only go so far as to conclude that statements in the Letter related to Mr. Gurmessa "support[ing] genocide" or "glorifying torture, lynching, massacre, and ethnic cleansing" (D.I. 1-

---

[9]    *Compare* D.I. 72-1, Ex. 1 ¶ 8 (Dr. Senay Declaration) (". . . as GPE told the United Nations, Oromo extremist groups (not 'Oromo generally'), leading up to the end of 2020 and continuing into the spring of 2021 and still today, implemented an 'us' versus 'them' propaganda and narrative, in deliberate effort to further a campaign of genocide, by, among other things, targeting even those who are not Amhara (including Oromo) who are determined to be too 'moderate' (including not sympathetic or not harsh enough) towards Amhara"); *Id.* ¶ 8 n.1 ("As noted in GPE's communication to the United Nations, an Oromo extremist group perpetrated violence (ultimately murder) on Amhara, which continued under various banners of different liberation fronts that are allied with this extremist group, such as the Tigray People Liberation Front ('TPLF'), and which morphed into a formal Ethiopian government regime (e.g., Ethiopian People's Revolutionary Democratic Front ('EPRDF')), *with* D.I. 79 (Dr. Gurmessa's Answering Brief at 14-15) ("The Plaintiff does not contest that the topic of genocide is of public significance. This is precisely why he utilized his social media to condemn genocide—the Tigray Genocide. The Defendant seems to hold a unilateral view, asserting that only the Amhara are victims of genocide, while disregarding the atrocities the Plaintiff and the international community have been vocal about. This stance may either signify an exaggeration on the Defendant's part or indicate a discriminatory campaign against the Oromo and other ethnic groups they seemingly disdain."); *Id.* at 17 ("Although the Court is familiar with the Plaintiff's preceding arguments on this, it's worth noting that subsequent international consensus echoed the Plaintiff's assertions, recognizing the complicity of the Amhara militia and the Ethiopian government in the Tigray genocide."); D.I. 79-3, Ex. 1 ("Despite their assertions to the contrary, the Defendant, along with numerous allies, has previously extended both written and material support to the Ethiopian government during its ill-conceived military campaign against the People of Tigray. This selective advocacy underscores their extremist stance, emphasizing concern solely for the Amhara Genocide, while seemingly disregarding other instances of genocide or crimes against humanity.").

1, Ex. 1) cannot, on their face, "reasonably be interpreted as stating actual facts." *Cousins*, 283 A.3d at 1158.

That is, ordinary readers of the Letter would understand GPE's use of words like "support[ing] genocide" as expressing its subjective interpretation of the tone and objective of Dr. Gurmessa's social media posts. *See Id.* at 1157. "That interpretation . . . is not, without more, objectively verifiable as true or false." *Id.* at 1148; *see also Avas Sales Lead Servs., Inc. v. Doe*, C.A. No. 21-1005-MN-SRF, 2022 WL 4245531, at *3 (D. Del. Sept. 15, 2022), *report and recommendation adopted*, C.A. No. 21-1005-MN, 2022 WL 5241911 (D. Del. Oct. 6, 2022) (applying *Cousins* and concluding that statement that plaintiff was "very sneaky" cannot "reasonably be read to state or imply provably false and defamatory facts" about plaintiff because statement "turns on the poster's personal view of what is 'sneaky,' and ordinary readers of this posting would understand the use of this adjective as the poster's subjective impression that is not 'objectively verifiable as true or false.'").

Dr. Gurmessa attempts to distinguish *Cousins* by arguing that, while the term "racist" is subjective, "genocide" is not. (D.I. 79 at 15–16, "In contrast, genocide is both well-defined and codified, showcasing the Defendant's attempt to draw a false equivalence. The suggestion that the *Cousins*' court would have deemed 'genocide' as subjective is a grave misrepresentation. The Plaintiff is left to wonder if, according to the Defendant, the Holocaust and the Amhara genocide are also open to interpretation. Treating genocide as a petty racial insult undermines its gravity."). But even Dr. Gurmessa's submissions seem to concede that he understands "genocide" to contain an element of subjectivity that renders it inactionable. For example, when criticizing Dr. Senay's declaration submitted in support of GPE's Motion, Dr. Gurmessa

acknowledges that GPE's stance on what amounts to a "purported Amhara Genocide" is subject to disagreement by others:

> Throughout her affidavit, Ms. Senay subjects the Court to lengthy passages laden with skewed perspectives and factually devoid tirades. Almost immediately, her attempt at legal argumentation appears shaky, particularly when she casually addresses the complex "element of subjectivity within the meaning of genocide." *This might imply her acknowledgement that reputable entities do not align with her stance, nor that of the organization she represents, regarding the purported Amhara Genocide.* Relying on a "merely an opinion" defense after being implicated in defamatory activities against a private individual, and further propagating unverified propaganda, does not stand as a valid justification.

(D.I. 79 at 5) (emphasis added).   Thus, I am not persuaded by Dr. Gurmessa's unsupported argument that, in determining what constitutes actionable defamation, allegations of being "racist" should be treated differently than allegations of "genocide" or of "supporting genocide," an even more amorphous phrase.[10]   On its face, GPE's subjective interpretations of Dr. Gurmessa's social media posts as set forth in the Letter are not objectively verifiable as true or false. *See Cousins*, 283 A.3d at 1155 n. 84, 1157 n. 99 (rendering not actionable a statement that expresses a "subjective view, an interpretation, a theory, conjecture, or surmise," rather than one "claiming to be in possession of objectively verifiable facts") (citations omitted).

### 2. *Whether the Letter Implies Existence of Actionable Defamatory Facts*

Having concluded that statements in the Letter are not provably false on their face given their subjectivity, I turn to whether "they can be reasonably understood to imply defamatory and

---

[10]   Dr. Gurmessa also appears to distinguish *Cousins* on the basis there are "subtleties and nuances" between *Cousins* and Dr. Gurmessa's instant action (D.I. 79 at 16, "Brazenly, the Defendant seeks to have the Court interpret *Cousins* as representing 'a matter of public concern' and 'nonactionable,' disregarding the subtleties and nuances inherent in the case."; *Id.* at 3).   But Dr. Gurmessa does not identify what such "subtleties and nuances" are, let alone explain why they would render *Cousins* inapposite.

provably false facts about" Dr. Gurmessa. *Cousins*, 283 A.3d at 1158. GPE argues that the facts underlying its statements are disclosed and, thus, the Letter cannot be understood to imply defamatory and provably false facts about Dr. Gurmessa. I agree.

I begin by setting forth the Delaware Supreme Court's evolving jurisprudence in this area. Prior to *Cousins*, issued in August of 2022, the Delaware Supreme Court first articulated the "undisclosed defamatory fact" exception *Kanaga v. Gannett Co., Inc.*, holding that "a statement of opinion would be actionable if it implies the allegation of undisclosed defamatory facts as the basis for the opinion." 687 A.2d 173, 179 (Del. 1996). Two years later in *Ramunno v. Cawley*, the Delaware Supreme Court explained how this exception works. 705 A.2d at 1036– 1037. In *Ramunno*, a plaintiff landlord sued a defendant tenant for libel based on a letter the tenant sent to newspaper stating that the landlord had "done well through poorly maintained" properties. *Id.* at 1036. Although the Superior Court dismissed the landlord's complaint after viewing the statements as constitutionally protected opinion, the Delaware Supreme Court reversed. *Id.* at 1035. Relying on *Kanaga* and the U.S. Supreme Court's decision in *Milkovich*, the *Ramunno* court explained that the claim that the landlord had "done well through poorly maintained properties . . . may suggest a defamatory factual basis not disclosed by the speaker":

> What is crucial is that the average reader is unable to discern the source of the statement. Nothing in the letter signals to the audience that [the tenant] is surmising or reasoning from facts made explicit in the letter. Readers are simply left to wonder what facts underlie [the tenant's] derogation of [the landlord's] real estate portfolio. These circumstances, we feel, fall squarely within the scope of *Kanaga* and *Milkovich*.

*Id.* at 1037.

In *Cousins*, the Delaware Supreme Court discussed *Kanaga*, *Milkovich*, and *Ramunno*. Mr. Cousins argued that Ms. Goodier's email implied the allegation of undisclosed defamatory

facts because Ms. Goodier did not attach his lawsuit in her email to Mr. Cousins' employer, leaving his employer "to speculate, for example, about what 'shockingly racist' statements Cousins made." *Id.* at 1158. The *Cousins* court disagreed, explaining that even though Ms. Goodier did not attach the lawsuit to her email, she included a link to a newspaper article that explained Mr. Cousins' lawsuit and included statements made by Mr. Cousins therein. *Id.* at 1158–59. The *Cousins* court explained:

> [U]nlike in *Ramunno*, where '[r]eaders [were] simply left to wonder what facts under[lay] [the tenant's] derogation of [the plaintiff's] real estate portfolio,' the essential fact upon which Goodier based her accusations was disclosed to the readers of her email at the Bayard firm. Those readers, moreover, were sophisticated lawyers who knew how to find the Unionville Lawsuit, even if the record does not show at this stage whether they in fact reviewed it. Indeed, Cousins admits that Bayard's president told him that none of Cousins' partners at the firm agreed with the Unionville Lawsuit. Taken together, these facts indicate to us that the recipients of Goodier's email did not have to speculate or wonder about the facts underpinning Goodier's statements.

*Id.* at 1159–60. As a result, the *Cousins* court held that, "[t]his reality is sufficient to defeat Cousins' claim that Goodier's email implies defamatory facts about Cousins that are provably false." *Id.* at 1160.

So too here. A reader of GPE's Letter was not "simply left to wonder what facts underlie" GPE's opinions that Dr. Gurmessa "openly supports genocide" because GPE attached Dr. Gurmessa's social media posts to the Letter. (D.I. 1-1, Ex. 1). Further, the Letter makes clear that Dr. Gurmessa's disclosed and included posts that form the basis of GPE's stated opinion. (*Id.* at 1, "[a]s we demonstrated in Exhibits 1-3 . . ."; *Id.* at 2, "This commentary of Dr. Tolessa Gurmessa shows . . . ."; *Id.*, "Given the above, just based on samples of his expressions and views that we came across . . ."; *Id.* at 3, "Therefore, in view of the compelling evidence . . .").

Dr. Gurmessa does not dispute that, by attaching his social media posts to the Letter, GPE disclosed the factual predicate underlying its opinion.  Instead, Dr. Gurmessa disputes whether the image he shared tended to illustrate "support" of "genocide."  The Letter describes the image as depicting an "Amhara farmer . . . made to kneel while being taunted by heavily armed militants before he was beheaded on camera, just like ISIS did."  (D.I. 1-1, Ex. 1 at 2).  Dr. Gurmessa insists that the "This claim is unequivocally untrue, as the unit identification visible on the individual's right breast clearly indicates his affiliation with the Oromia Police force."  (D.I. 79-3, Ex. 2).[11]

But in *Cousins*, the Delaware Supreme Court's inquiry and the test it articulated focuses on whether facts underlying the alleged defamatory statements were disclosed—that is, whether Ms. Goodier's email including a link to a newspaper article disclosed the factual predicate for her charge of racism.  *Cousins*, 283 A.3d at 1156 ("What is crucial is that the average reader is able to discern the source of the statement.") (quoting *Ramunno*, 705 A.2d at 1037).  Critically, the Delaware Supreme Court did not consider the truth or falsity of that underlying factual predicate—that is, whether those facts tended to prove or disprove whether Mr. Cousins is a racist.[12]  Thus, following *Cousins*, I do not need to resolve whether the image depicted an Amhara farmer (as GPE maintains) or a member of the Oromia police force (as Mr. Gurmessa contends), nor does the existence of a disagreement mandate that summary judgment be denied.

---

[11]     *See also* D.I. 80 (Dr. Gurmessa's Declaration) at ¶ 11 ("False Information Submitted by Defendant: I would like to alert the court to the fact that I have not watched or commented on a video of an Amhara farmer being beheaded, as no such video exists.")

[12]     Indeed, the *Cousins* court seemed to acknowledge that there was a disagreement on this point, noting that the managing partner of Mr. Cousin's firm apparently agreed that Mr. Cousins was not, as Mr. Goodier alleged, a racist.  *Cousins*, 283 A.3d at 1145.  Instead, the Delaware Supreme Court's inquiry was whether the basis for Ms. Goodier's opinion was fairly disclosed.

This is because, much like in *Cousins* where there was a dispute over whether the complaint revealed that Mr. Cousins is a racist, there is here a dispute whether the image that Dr. Gurmessa commented on actually documents a genocide.

Dr. Gurmessa further suggests that I should not follow *Cousins* because it was decided after this Court denied GPE's motion to dismiss for failure to state a claim. But "[i]f the highest state court has spoken on the specific issues before me, those pronouncements are controlling." *McCusker v. Surgical Monitoring Assocs.*, C.A. No. 01-891-KAJ, 2005 WL 348307, at *3 (D. Del. Feb. 7, 2005) (citing *General Refractories Co. v. Fireman's Fund Ins. Co.*, 337 F.3d 297, 303 n. 1 (3d Cir. 2003)).

Dr. Gurmessa next argues that GPE's reliance on *Cousins* is an attempt to relitigate issues that this Court already rejected in denying GPE's motion to dismiss. (D.I. 79 at 14–15). I understand Dr. Gurmessa to be arguing that, because his defamation claim survived the motion to dismiss stage, it should also survive summary judgment. That, again, is not the law. While Dr. Gurmessa benefitted from all inferences drawn in his favor at the motion to dismiss stage, Dr. Gurmessa now bears the burden to come forward with evidence sufficient to prove his defamation claim at summary judgment—and, in speech regarding public concern, it is Dr. Gurmessa who must carry the burden. *Cousins*, 283 A.3d at 1148 n.40 (citing *Hepps*, 475 U.S. at 775–76). Dr. Gurmessa has offered no argument, let alone any evidence, that an "ordinary reader could infer the existence of facts which are capable of being proved true or false." D.I. 33 at 10; *see Lamplugh v. PFB Energy*, C.A. No. 19-218-MN, 2022 WL 2982513, at *5 (D. Del. July 28, 2022) (granting defendants' motion for summary judgment on defamation claim where claim was unsupported by record evidence).

Moreover, Dr. Gurmessa's reliance on the Court's opinion at the motion to dismiss stage is misplaced. Pre-*Cousins*, neither party argued that the speech at issue was entitled to First Amendment protection or that it was entitled to heightened protection given the public interest concerns. As a result, the Court's inquiry was narrowly focused on whether Dr. Gurmessa's Complaint contained sufficient factual assertions that, if taken as true, could state a claim for defamation. At summary judgment, and under the guidance of *Cousins*, the Court's inquiry is necessarily different. Applying *Cousins* now, I conclude that the GPE's statements in the Letter are not actionable.

* * *

For the foregoing reasons, I conclude that the Letter does not give rise to an actionable defamation claim in light of the Free Speech Clause of the First Amendment. I note that Dr. Gurmessa points out that his social media posts and political opinions were a protected exercise of his First Amendment rights—a fact that no one contests. But Dr. Gurmessa's "choice to lead the charge on one side of a controversial and sensitive public debate carried with it the predictable consequence that others of a different mind would exercise their own First Amendment rights in opposition." *Cousins*, 283 A.3d at 1167.

## IV.   CONCLUSION

For the foregoing reasons, I recommend that GPE's Motion be granted, that judgment be entered in GPE's favor on Dr. Gurmessa's Complaint, and that the case be closed.[13] As a result, I

---

[13]   Because I recommend entry of judgment in GPE's favor based on the reasons discussed in this Report and Recommendation, I do not address GPE's remaining grounds for summary judgment related to whether Dr. Gurmessa's defamation claim lacks proximate causation with respect to any of the statements highlighted in the Letter and whether Dr. Gurmessa must prove actual malice. In any event, I note that Dr. Gurmessa has not addressed these grounds in his Answering Brief. (D.I. 79). Thus, I would either treat the Motion as

also recommend that Dr. Gurmessa's co-pending motions for sanctions based on non-disclosure during jurisdictional discovery, to order defendant to provide consent for production of email metadata, and to compel defendant to produce information on litigation funding resources (D.I. 69) be denied as moot.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), (C), Federal Rule of Civil Procedure 72(b)(1), and D. Del. LR 72.1. Any objections to the Report and Recommendation shall be filed within fourteen days and limited to ten pages. Any response shall be filed within fourteen days thereafter and limited to ten pages. The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the District Court.

The parties are directed to the Court's "Standing Order for Objections Filed Under Fed. R. Civ. P. 72," dated March 7, 2022, a copy of which can be found on the Court's website.

Dated: August 8, 2024

_____
Laura D. Hatcher
United States Magistrate Judge

---

unopposed on those issues or deem them waived. *See Sprint Commc'ns Co., L.P. v. Mediacom Commc'ns Corp.*, C.A. No. 17-1736-RGA, 2021 WL 982737, at *1 (D. Del. Mar. 16, 2021) (treating motion for summary judgment as "unopposed" when non-movant "said nothing about [a movant's ground for summary judgment] in the answering brief"); *Horatio Washington Depot Techs. LLC v. TOLMAR, Inc.,* C.A. No. 17-1086-LPS, 2018 WL 5669168, at *7 n.4 (D. Del. Nov. 1, 2018), *order corrected*, C.A. No. 17-1086-LPS, 2018 WL 6168617 (D. Del. Nov. 26, 2018), *and report and recommendation adopted,* C.A. No. 17-1086-LPS-CJB, 2019 WL 1276028 (D. Del. Mar. 20, 2019) (collecting cases explaining that arguments not raised in briefs are waived).